UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

VALERIE GONZALES, and
MARIA SALAZAR, on behalf of themselves and
all others similarly situated,

                                Plaintiffs,

                v.

CITY OF AUSTIN,

                                Defendant.

Civil Action No. 15-cv-956

**CLASS ACTION COMPLAINT**

## NATURE OF THE ACTION

1.      Plaintiffs in this case face the threat of jail solely because they cannot afford to pay their debts. The City of Austin regularly jails people who are too poor to pay their fines and fees for petty misdemeanors, such as traffic tickets, in violation of the Sixth and Fourteenth Amendments to the United States Constitution. Specifically, the City jails people without appointing an attorney to represent them and without asking whether they have the money to pay their debt. Plaintiffs bring this class action to vindicate their constitutional rights to counsel, due process, and equal protection.

2.      The City jails people through its operation of the Austin Municipal Court, which has criminal jurisdiction limited to the least serious crimes punishable in the State of Texas. The court assesses impoverished people exorbitant fines and fees, then arrests and jails people who fall behind on their payments, violating their constitutional rights in the process. This practice deprives people of their physical liberty, threatens the stability of their employment and housing, and separates them from their children and families.

3.      Through this case, Plaintiffs seek to ensure only that the City provides basic procedural protections before it jails people for failing to pay fines and fees for traffic tickets and other petty misdemeanors. The City's constitutionally deficient process results in the imprisonment of hundreds of people each year. Plaintiffs seek an injunction prohibiting the City from jailing people who are too poor to pay without the procedural protections guaranteed by the Sixth and Fourteenth Amendments.

## JURISDICTION AND VENUE

4.      This is a civil rights action arising under 42 U.S.C. § 1983, 28 U.S.C. § 2201 *et seq.*, and the Sixth and Fourteenth Amendments to the United States Constitution. This Court has

jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and § 1343 (civil rights jurisdiction).

5.      Venue in this district is proper under 28 U.S.C. § 1391(b)(1), because the City of Austin resides in this district, and under § 1391(b)(2), because a substantial part of the events giving rise to the Plaintiffs' claims occurred in this district.

## PARTIES

6.      Plaintiff Valerie Gonzales is a thirty-one-year-old mother who resides in Austin, Texas. She lives near the federal poverty level.[1] She is at risk of being jailed, without an attorney to defend her, due to her inability to pay her debt for traffic tickets.

7.      Plaintiff Maria Salazar is a thirty-year-old mother who resides in Austin, Texas. She lives near the federal poverty level. She is at risk of being jailed, without an attorney to defend her, due to her inability to pay her debt for traffic tickets.

8.      Defendant City of Austin is a municipality organized under the laws of the State of Texas. The City of Austin has established the Austin Municipal Court as a department of the City. The City of Austin may be served with process by serving the City Clerk, Mayor, Treasurer, or Secretary at 301 W. 2nd Street, Austin, Texas 78701.

---

[1] *See* Annual Update of the HHS Poverty Guidelines, 80 Fed. Reg. 3236 (Jan. 22, 2015), *available at* https://www.federalregister.gov/articles/2015/01/22/2015-01120/annual-update-of-the-hhs-poverty-guidelines - t-1. Each year, the U.S. Department of Health and Human Services establishes the federal poverty guidelines based on the consumer price index for that year. The federal poverty level is used to determine eligibility for governmental assistance. For example, people who make up to 400% of the federal poverty level are eligible for health insurance tax credits.

## FACTS

**Valerie Gonzales**

9.      Plaintiff Valerie Gonzales is a thirty-one-year-old mother and caretaker of five disabled minor children. She lives with her children in Austin.

10.      The Austin Municipal Court jailed Ms. Gonzales for failure to pay her traffic tickets in August 2015. At the time of her arrest and incarceration, Ms. Gonzales was unemployed because the store where she worked had recently closed. She lived with her husband, who earned approximately $2000 a month. Ms. Gonzales had been living near the poverty line and in and out of homelessness. Even when Ms. Gonzales was working, her family had made at most $36,000 a year to support a family of six, or 110% of the federal poverty level. They received, and continue to receive, food stamps, Medicaid, and public assistance for housing.

11.      Over a period of nine years, the City of Austin gave Ms. Gonzales many tickets including two tickets for speeding, two tickets for other minor traffic offenses, and twelve tickets for offenses resulting from poverty, such as driving without a valid driver's license, driving without insurance, and failing to register her car. Ms. Gonzales and her husband did not have enough money to pay these debts because of their modest income and the expenses necessary to feed and shelter their family.

12.      Ms. Gonzales received many tickets because she could not pay for insurance or current registration for her car. The Department of Public Safety also prohibited Ms. Gonzales from obtaining a valid driver's license due to her outstanding tickets. Nevertheless, Ms. Gonzales had to keep driving to care for her family. She was stuck—she was repeatedly ticketed for offenses such as driving without a valid license, but she was unable to obtain a valid license until she paid off all of her traffic tickets.

4

13.     On the evening of August 16, 2015, Ms. Gonzales was a passenger in a car accident. Officers who responded to the scene arrested Ms. Gonzales because of outstanding warrants on her traffic tickets.

14.     At the jail, the officers treated her as they would treat a dangerous mentally ill person because she was crying as a result of the car accident. They handcuffed her, stripped her naked, forced her to wear a mask over her face, and locked her alone in an observation cell. After about thirty minutes, one guard concluded that this harsh treatment was unnecessary. Officers then allowed Ms. Gonzales to dress and took her to a hospital to be checked for injuries from the car accident. After Ms. Gonzales returned from the hospital, she waited more than twelve hours to see an Austin Municipal Court judge.

15.     The judge told Ms. Gonzales that he would not accept any excuses for her failure to pay the tickets. Ms. Gonzales tried to explain her financial situation, but the judge told her that she would be sent to jail if she could not pay $1000 that day.

16.     The judge did not ask Ms. Gonzales about her income, her dependents, or other factors bearing on her ability to pay. He did not inquire into Ms. Gonzales's ability to complete community service. He did not consider reducing the debts based on Ms. Gonzales's ability to pay.

17.     The judge stated that Ms. Gonzales would remain in jail for forty-five days. Upon information and belief, the judge calculated this term on the basis of Ms. Gonzales's debt, which was more than $4500, and his assumption that the Travis County Sheriff would release Ms. Gonzales after she "satisfied" $100 of the debt with each day in jail.

18.     At no point in Ms. Gonzales's traffic ticket cases did the court inquire into her ability to afford counsel, take any steps to appoint counsel, or obtain a knowing, voluntary, and

intelligent waiver of Ms. Gonzales's right to counsel. Ms. Gonzales cannot afford counsel. She was not represented by counsel when she entered a plea on any one of her underlying traffic tickets. She did not waive her right to counsel in any of those proceedings.

19.     Ms. Gonzales sat in jail for two days. On the third day, with the assistance of pro bono counsel whom she obtained without any assistance from the court, Ms. Gonzales petitioned the Austin Municipal Court for her release. Her counsel argued that she was unconstitutionally incarcerated. Based on counsel's motion, the court found Ms. Gonzales to be indigent and agreed to release her with jail credit of $200 per day of jail time and an order to work off the remaining debt by completing 395 hours of community service. The court did not reduce Ms. Gonzales's outstanding debt.

20.     After Ms. Gonzales was released, one of her sons, who is in elementary school and severely disabled, had repeated and serious psychiatric issues at school. Ms. Gonzales was called to the school nearly every day to manage her son's behavior and take him to appointments with his psychiatrist to adjust his medication.

21.     As a result of these repeated childcare issues, Ms. Gonzales lost her job. Her husband also moved out of the house and stopped supporting the family. At the same time, Ms. Gonzales's oldest son stopped living with a cousin and moved back into her home.

22.     Ms. Gonzales and her five children spent a few weeks living on Social Security income and occasional child support payments from the children's father. She began a new job the week of October 19, 2015, and she now earns approximately $2000 a month, an income that leaves her household near the federal poverty level. Despite her best efforts, she does not make enough money to pay the full amount of her debt to the Austin Municipal Court.

23.     It would be a hardship for Ms. Gonzales to perform community service. Ms. Gonzales called the court to attempt to negotiate a workable solution, but she was instructed to simply perform the community service hours that she could. Court staff instructed Ms. Gonzales that if she did not satisfy her community service obligation of 18 hours a month, the court would eventually issue a warrant for her arrest. Ms. Gonzales is at risk of the Austin Municipal Court issuing warrants, which she cannot afford to clear, and jailing her to "satisfy" her debts.

**Maria Salazar**

24.     Plaintiff Maria Salazar is a thirty-year-old mother and primary caretaker of her six minor children. She lives with her children and her boyfriend in Austin.

25.     Ms. Salazar is seven months pregnant. She has been diagnosed with anemia during pregnancy, and she is taking iron supplements.

26.     For the last four years, Ms. Salazar has been the sole caretaker for her six children. She and her children receive public assistance for housing, food stamps, and Medicaid. Three of her children receive child support, and in November, she expects that her other three children will begin receiving child support.

27.     Ms. Salazar is not employed because she is the primary caretaker for her eighteen-month-old twins, for whom she cannot afford child care. In the past, she has worked as a manager for a commercial cleaning company. Despite her best efforts, she does not make enough money to pay the full amount of her debt to the Austin Municipal Court.

28.     Since April 2015, Ms. Salazar's boyfriend has been living with her and her children. He is employed as a welder. Even with his support, Ms. Salazar's household income is near the federal poverty line. Ms. Salazar's boyfriend also supports his two children, who do not live with him.

29.     Over a period of eleven years, the City of Austin gave Ms. Gonzales many tickets including six for speeding and eight for offenses resulting from poverty, such as driving without a valid driver's license and driving without insurance. Ms. Salazar did not have enough money to pay these debts because of her modest income and the expenses necessary to feed and shelter her family.

30.     Ms. Salazar received many tickets because she could not pay to have the suspension on her driver's license lifted or pay for insurance. The Department of Public Safety prohibited Ms. Salazar from obtaining a valid driver's license due to her outstanding tickets. Nevertheless, Ms. Salazar had to keep driving to care for her family. She was stuck—she was repeatedly ticketed for offenses such as driving without a license and insurance, but she was unable to obtain a license or afford insurance until she paid off all of her traffic tickets.

31.     In August 2015, a police officer pulled Ms. Salazar over. The officer ultimately arrested her because of outstanding warrants from the unpaid tickets as well as a child support hold. (The child support was an administrative mistake, and she later had the hold cleared.) Ms. Salazar was five months pregnant at the time. She was taken to Travis County jail, where she spent the night waiting to see an Austin Municipal Court judge, whom she saw the next morning.

32.     The judge told Ms. Salazar that he would order her to complete community service to satisfy the debts on her ten tickets with outstanding warrants. He ordered Ms. Salazar to complete a total of 336 hours of community service at 30 hours of community service a month, with the first 30 hours due September 29, 2015. Ms. Salazar wanted to ask for a payment plan because of the difficulties of completing community service due to her pregnancy and her childcare responsibilities, but the judge did not give her a chance to do so.

33.     The judge did not ask Ms. Salazar about her income, her dependents, or other factors bearing on her ability to pay. He did not inquire into her ability to complete community service. He did not consider reducing the debts based on Ms. Salazar's ability to pay.

34.     As a result of the arrest in August 2015, the City again charged Ms. Salazar for driving without a valid driver's license. She has an upcoming court hearing for that charge.

35.     After Ms. Salazar was released from jail, she completed 50 hours of community service. On or about September 29, 2015, when Ms. Salazar went to Austin Municipal Court and turned in proof of the work she had completed, the clerk's office employee at the window told Ms. Salazar that she had more cases that would be coming into warrant status later that month. He told her to come back the next week and talk to the judge presiding over a walk-in docket, in order to have the judge add all of her other tickets to the community service order and clear them all through community service.

36.     On October 5, 2015, Ms. Salazar returned to the Austin Municipal Court and appeared for the walk-in docket. She told the judge that she needed to add the cause numbers from her other tickets to her community service order, so that she could satisfy the debts in all of her cases with community service. The judge added the remaining cause numbers and ordered Ms. Salazar to complete an additional 25 hours of community service.

37.     Ms. Salazar was visibly pregnant during this court appearance. Ms. Salazar also explicitly expressed her concern to the judge that she would not be able to complete her community service requirements because she is expecting a baby in December 2015. The judge told Ms. Salazar to mention the issue at her next court appearance for her newest charge of driving without a valid license. He did not inquire into Ms. Salazar's ability to pay or consider

whether community service would be an undue hardship to her given her present circumstances. Instead, the judge left Ms. Salazar's community service order in place.

38.     Ms. Salazar had been arrested due to Austin Municipal Court warrants on one occasion prior to August 2015. In 2013, an officer arrested Ms. Salazar because of outstanding warrants on her traffic tickets and booked her into Travis County Jail. Ms. Salazar was brought before an Austin Municipal Court judge.

39.     The judge ordered Ms. Salazar to complete community service every month for several months. The judge did not ask Ms. Salazar about her ability to pay, and he did not consider reducing the debts based on her ability to pay. He did not inquire into her ability to complete community service. Ms. Salazar was released the same day.

40.     Ms. Salazar was unable to complete the community service as ordered by the court in 2013. Circumstances such as Ms. Salazar's inability to afford childcare, as well as her pregnancy with twins, made performing community service a hardship.

41.     At no point in Ms. Salazar's traffic ticket cases did the court inquire into her ability to afford counsel, take any steps to appoint counsel, or obtain a knowing, voluntary, and intelligent waiver of her right to counsel. While each of Ms. Salazar's cases was pending, she was unable to afford counsel. She was not represented by counsel when she entered a plea on any one of her underlying traffic tickets. She did not waive her right to counsel in any of those proceedings.

42.     At no point in Ms. Salazar's traffic ticket cases did the court make a meaningful determination about her ability to pay. At no point did the court consider whether the community service ordered would be an undue hardship for Ms. Salazar.

43.     Ms. Salazar is likely unable to complete her current community service requirements because of her pregnancy and impending childbirth. She is at risk of the Austin Municipal Court issuing warrants, which she cannot afford to clear, and jailing her to "satisfy" her debts.

## I.     Legal Framework for the Austin Municipal Court's Jurisdiction Over Petty Crimes

44.     The City of Austin vests the Austin Municipal Court with jurisdiction over "fine only" crimes, which include Class C misdemeanors. Austin, Tex., Charter art. VI; Tex. Gov. Code §§ 29.003, 30.00003–30.00005. Class C misdemeanors are the least serious crimes punishable in the State of Texas, such as failure to signal while changing lanes or entering a park after hours.

45.     Under municipal law, the City Council has appointed a Presiding Judge and a Clerk of Court for the Austin Municipal Court. Austin, Tex., City Code §§ 2-10-2, 2-10-11. The Presiding Judge has the duty to adopt "rules for the orderly trial of a case in the municipal court." *Id.* The Austin Municipal Court is made up of nine full-time and eleven part-time judges.

46.     The Presiding Judge and the Clerk of Court act as policymakers for the Austin Municipal Court. References to "the Austin Municipal Court" or "the court" denote an entity that includes municipal judges and staff in the clerk's office.

## II.     Constitutional Protections for People Prosecuted in Austin Municipal Court

47.     The Due Process and Equal Protection Clauses of the Fourteenth Amendment, along with the Sixth Amendment, protect people who are prosecuted for petty crimes, such as Class C misdemeanors.

48.     The Due Process Clause requires courts to hold an ability to pay hearing before jailing a poor person for failure to pay a criminal judgment debt. *Bearden v. Georgia*, 461 U.S.

660 (1983). At that hearing, the court must inquire into the reason the person failed to pay and consider alternatives to jail, such as tailoring the debt to the person's resources. *Id.* at 672.

49.     The Equal Protection Clause prohibits courts from jailing someone for a fine-only offense solely because she lacks the ability to pay. *Tate v. Short*, 401 U.S. 395 (1971); *Williams v. Illinois*, 399 U.S. 235 (1970).

50.     The Sixth Amendment prohibits courts from jailing a person for a conviction secured without the assistance of counsel for the accused. *Argersinger v. Hamlin*, 407 U.S. 25 (1972). If a trial court fails to appoint counsel for the accused in a misdemeanor case, the court cannot impose a jail term as punishment for a resulting conviction. *Id.* Without the assistance of counsel at trial, the court can never impose a term of imprisonment for that offense. *Alabama v. Shelton*, 535 U.S. 654 (2002).

51.     The Equal Protection Clause of the Fourteenth Amendment prohibits the government from stripping criminal judgment debtors of the rights afforded to civil judgment debtors and using unduly harsh methods of debt collection for criminal judgment debt. *James v. Strange*, 407 U.S. 128 (1972).

## III.    The Austin Municipal Court's Policies and Practices Violate the Constitutional Rights of People Who Are Too Poor to Pay

52.     Class C prosecutions in Austin Municipal Court trap people who are too poor to pay in an endless cycle of accumulating debt. The court burdens people who are too poor to pay with additional fees and logistical hurdles at every step of the process, then arrests people who cannot pay and denies them the procedural protections required by the Constitution. For people who are too poor to pay, the almost-inevitable result of this system is jail time.

53.     The first step in the life of nearly every Class C prosecution is a ticket. When a police officer issues a ticket, she instructs the recipient to sign the bottom of the ticket, which

contains a promise to pay a fine or appear in Austin Municipal Court. People who are capable of paying their tickets in a lump sum typically resolve their cases by mailing the court a check.

54.     People who are too poor to pay must appear in court. If a person fails to appear in court, the judge has the option to either reschedule the appearance without a formal order, issue a summons ordering the person to appear, or issue a warrant for the person's arrest. Tex. Code Crim. Proc. Arts. 15.03, 45.014.

55.     The Austin Municipal Court has a policy and practice of issuing an arrest warrant and increasing all fines by 50% the first time a person fails to appear. The court charges a $50 fee for each ticket for which a warrant has been issued—the first of many fees the court adds on top of the initial ticket. The court also charges "bail" to clear these warrants. "Bail" is the full amount that the ticket would cost if the person who received the ticket pled guilty. People who are too poor to pay the "bail" are not allowed to clear their warrant by rescheduling a court date over the phone.

56.     People with open warrants for failing to appear in court are arrested as a result of encounters with the police. Once arrested, they are taken before a judge of the Austin Municipal Court.

57.     Once a person appears in court—whether voluntarily or upon arrest—the next step is to either go to trial, plead no contest, or plead guilty. Upon conviction, Texas law authorizes the court to assess a fine up to $500, court costs, and various fees that cause the debt to spiral further out of control.

58.     For example, the Austin Municipal Court has a policy and practice of charging a $25 fee to set up a payment plan for each ticket. In other words, if someone with three tickets

asks for a payment plan because she is too poor to pay her tickets up front, the court charges her an extra $75.

59.     The Austin Municipal Court has a policy and practice of charging a $30 fee for a credit card payment or check that is rejected.

60.     The Austin Municipal Court has a policy and practice of charging a $30 driver's license renewal suspension fee to people who are too poor to pay their tickets. In addition, when the court refers a ticket to a collection agency, the court charges a 30% collection fee.

61.     Texas law provides the Austin Municipal Court with many options for easing the burden of these fines and fees on people who are too poor to pay. The court is authorized to convert the debt to a civil judgment, order the ticket recipient to make payments under a payment plan, or order her to discharge her debt through community service. Tex. Code Crim. Proc. Arts. 45.0047, 45.049. The court is also authorized to waive part or all of the outstanding debt for any person who is too poor to pay or perform community service without undue hardship. *Id.* Art. 45.0491.

62.     The Austin Municipal Court fails to consider the full range of these options. The court has a policy and practice of refusing to partially or fully waive debt, or collect debt as a civil judgment, for people too poor to pay in full. The court has a policy and practice of limiting people to two options—community service or a payment plan on the full amount of the debt—regardless of whether these options impose an undue hardship.

63.     Taking advantage of these two options is not easy. The Austin Municipal Court's payment plan application does not include spaces for explaining essential financial information, such as how many children a person has, or whether they receive governmental assistance for the poor. The Austin Municipal Court does not post a community service application on its website.

14

Clerk's office staff have a policy and practice of refusing to offer the payment plan or community service options unless a person has already missed the deadline to pay their fines and fees, risking issuance of a warrant and additional fees.

64. The Austin Municipal Court has a policy and practice of issuing an arrest warrant called a "capias pro fine" warrant if a person misses their deadline to make payments or perform community service. For people who appear in person, prove their poverty, and establish a payment plan, Clerk's office staff refuse to clear their capias warrants until the person makes a payment. Capias warrants put people who are too poor to pay at high risk of being arrested and jailed.

65. For people whose cases are referred to a collections agency, the court has a policy and practice of refusing to clear capias warrants unless the court receives separate payments on each outstanding ticket. In other words, even if a person is making regular payments toward the balance of one ticket, the court refuses to clear outstanding capias warrants on that person's other tickets.

66. The Austin Municipal Court has a policy and practice of demanding arbitrary, on-the-spot payments from people who appear in court—whether voluntarily or upon arrest—to clear a capias pro fine warrant. For people with smaller debts, the court has a policy and practice of demanding the amount of money in the person's pockets before letting them go. For people with larger debts, the court asks how much money the person would be able to produce that day, and orders the person to produce that amount under the threat of jail time.

67. The Austin Municipal Court also charges a $50 fee for each capias pro fine warrant the court issues. In other words, if a ticket recipient is too poor to pay or perform community service, she is subjected to an endless cycle of warrants that increase the debt she

owes to the court. For example, for a person who is too poor to make payments or take time off from work, debt from a single ticket for failure to signal while changing lanes can accumulate like so:

| Fine | $   66.00 |
|---|---|
| Court Costs | $ 103.00 |
| Late Fine Increase (50%) | $   33.00 |
| Arrest Warrant Fee | $   50.00 |
| Check Return Fee | $   30.00 |
| Payment Plan Fee | $   25.00 |
| License Renewal Suspension Fee | $   30.00 |
| Capias Warrant Fee | $   50.00 |
| | $ 387.00 |
| Collection Fee | x    1.30 |
| **Total** | **$ 503.01** |

68.     The Austin Municipal Court adjudicates over 150,000 Class C misdemeanor cases per year, resulting in approximately $30 million in gross collections.

69.     As described in detail below, the Austin Municipal Court has a policy and practice of jailing people who take too long to satisfy their ever-growing debts. The court has a policy and practice of jailing people until their debts are "satisfied," or for a "total layout" of the debt. The court then issues "jail credit," or monetary credit for jail time, at a default rate of $100 per day. That default rate can be modified arbitrarily. The court has a policy and practice of adjusting the amount of jail credit granted per day based on the date the Travis County Sheriff's Office releases people who are jailed. In so doing, the court delegates authority to the Sheriff's Office to determine how long people must sit in jail to "satisfy" their debt.

70.     The Austin Municipal Court does not automatically issue jail credit in all cases. In cases where jail credit is not automatically issued, people who are jailed must provide proof of incarceration to the Austin Municipal Court—even if the Austin Municipal Court is the same

court that committed the person to jail. The Austin Municipal Court has a policy and practice of charging people a fee in order to obtain proof that the court jailed them.

71.     These policies and practices affect thousands of Austin residents. The Austin Municipal Court issued jail credit in nearly 20,000 cases in fiscal year 2012–2013. During that same period, the Austin Municipal Court refused to waive one dollar of outstanding debt in any of its more than 170,000 cases.

**A.     The Austin Municipal Court Jails People Solely Because They Are Too Poor to Pay, Without Inquiring Into Ability to Pay or Alternative Punishments**

72.     The Austin Municipal Court has a policy and practice of jailing people solely because they are unable to satisfy their criminal judgment debt, even if they can demonstrate that their failure to pay or perform community service was not willful.

73.     The Austin Municipal Court has a policy and practice of bringing people who are arrested on capias pro fine warrants to Central Booking, where they are processed into Travis County Jail. Their clothes and belongings are confiscated. They are brought before a municipal judge in jail-issued striped pajamas, shackled to one another at the wrist. Under these circumstances, the court holds brief hearings to determine whether to send each person to jail.

74.     The Austin Municipal Court has a policy and practice of jailing people without any meaningful inquiry into their reasons for failing to pay. The court jails people without inquiring into their income, expenses, household dependents, or other circumstances bearing on their ability to pay.

75.     The Austin Municipal Court has a policy and practice of holding jail commitment hearings without prior notice that the hearing will take place, and without informing ticket recipients that their ability to pay or perform community service is a crucial issue in the hearing.

76.     The Austin Municipal Court has a policy and practice of failing to provide form financial information affidavits to arrestees during jail commitment hearings.

77.     The Austin Municipal Court has a policy and practice of failing to make meaningful inquiries into alternatives to imprisonment, including collection of outstanding debt as civil judgment debt and reducing or waiving debts.

78.     The court's policies and practices are reflected in the preprinted form the court uses to commit people to jail. The form, which judges fill in by hand, does not include a space to enter meaningful factual findings about constitutionally-required considerations, such as the person's ability to pay, the adequacy of alternative punishments, and the necessity of jail time to satisfy the state's interest in punishment. There is no preprinted form for tailoring outstanding debts to the person's resources.

79.     The court's policies and practices are reinforced by the Austin City Code. Section 2-10-21 of the Austin City Code provides: "If a defendant defaults on payment of a fine or fails to comply with alternative sentencing, a judge may imprison the defendant until the fine is paid in full." This Section does not require the court to inquire into ability to pay or consider alternative punishments, such as tailoring a fine to the person's resources, for people who are unable to pay.

80.     These policies and practices are also reinforced by the Austin Municipal Court Rules. Rule 9.4, "Inability to Pay Fine," provides that the court "may" order a payment plan or community service in lieu of immediate payment of a fine, "[i]f the defendant qualifies." The Rules do not describe the criteria for permitting people to satisfy their debts through payment plans or community service. The Rules do not require the court to consider alternative punishments, such as tailoring a fine to the person's resources, for people who are unable to pay.

81.     The court has a policy and practice of failing to provide any procedures or guidelines for jailing people who have not paid their outstanding debts. No provision of the Austin City Code or the Austin Municipal Court Rules establishes such procedures or guidelines.

82.     The best evidence of the court's failure to consider alternatives to jail is its own data on debt waivers. The Austin Municipal Court's self-reported data indicate that the court waived debt in just 11 of more than 600,000 cases between September 2011 and September 2015. During the same time period, on information and belief, the court jailed more than 2000 people.

83.     Altogether, the Austin Municipal Court has a policy and practice of failing to comply with any aspect of the ability to pay hearing required under the Due Process Clause. As a result, the court has a policy and practice of jailing people solely because they are unable to satisfy their criminal judgment debt[2], in violation of their rights under the Equal Protection Clause. People who are genuinely unable to make debt payments or perform community service, such as the named Plaintiffs, are jailed solely because of their lack of resources.

84.     As evidenced by the Austin Municipal Court Rules and preprinted form orders, these policies and practices are so persistent and widespread that knowledge of the policies and practices is attributable to municipal policymakers.

**B.    The Municipal Court Imprisons People For Criminal Convictions Entered Without Assistance of Counsel**

85.     The Austin Municipal Court has a policy and practice of entering Class C misdemeanor convictions without the benefit of counsel for the accused, and then using those convictions as a basis for jailing people.

---

[2] Plaintiffs do not challenge the court's authority to jail people for willful nonpayment of debt or other actions in contempt of court.

86.     The Austin Municipal Court has a policy and practice of refusing to appoint counsel for people charged with Class C misdemeanors. No provision of the Austin City Code or the Austin Municipal Court Rules discusses appointing counsel in these cases. The Austin Municipal Court has no system for appointing counsel. The Austin Municipal Court's website states that the court does not appoint counsel.

87.     The Austin Municipal Court has the power to jail people for failure to pay their criminal judgment debt. Tex. Code Crim. Proc. Art. 45.4046. The Austin Municipal Court has a policy and practice of using this power to impose a jail term to punish Class C offenses.

88.     The court has a policy and practice of issuing orders jailing people "on the above stated cause(s)," which are the underlying Class C offenses. The court has a policy and practice of jailing people to "lay out" or "satisfy" the fines and fees imposed for the underlying Class C offenses. The court therefore has a policy and practice of jailing people as a result of their Class C misdemeanor convictions entered without the assistance of counsel.

89.     The Austin Municipal Court has a policy and practice of failing to obtain knowing, voluntary, and intelligent waivers of counsel from people whom the court later jails for Class C offenses.

90.     As evidenced by the lack of a system for appointing counsel and hundreds of people jailed each year, these policies and practices are so persistent and widespread that knowledge of the policies and practices is attributable to municipal policymakers.

## C.     The Municipal Court Employs Unduly Harsh and Discriminatory Terms for Collecting Criminal Judgment Debt, in Contrast to Civil Judgment Debt

91.     If the debt resulting from Class C tickets were owed to a private party as a civil debt, the tools available to the debt collector would be much more limited. The Texas Constitution prohibits jailing almost any civil debtors, with narrow exceptions for debtors in

contempt of court who have willfully failed to pay a legal financial obligation. Tex Const. Art. I, § 18; *Ex parte Sutherland*, 526 S.W.2d 536 (Tex. 1975).

92.     Even civil debtors in contempt of court have significantly stronger procedural protections than the protections afforded by the Austin Municipal Court. Civil debtors are entitled to meaningful written notice of the accusations against them, appointed counsel for their defense, a hearing on willfulness, the complete defense of inability to pay, and a written commitment order if the court decides to imprison the contemnor. Tex. Fam. Code § 157.163; *Ex parte Chambers*, 898 S.W.2d 257 (Tex. 1995); *In re Griffith*, 434 S.W.3d 643 (Tex. App. Houston 2014); *In re Acceptance Ins. Co.*, 33 S.W.3d 443 (Tex. App. Ft. Worth 2000); *Ex parte Rosser*, 899 S.W.2d 382 (Tex. App. Houston 1995); *Ex parte Strickland*, 724 S.W.2d 132 (Tex. App. Eastland 1987).

93.     The Austin Municipal Court has a policy and practice of failing to provide criminal judgment debtors these basic protections.

94.     The Austin Municipal Court's policy and practice of collecting Class C debt is unduly harsh and discriminatory as applied to people who are too poor to pay. The threat of imprisonment also induces impoverished families to forego paying for basic needs, such as paying their electricity bill, in order to make their payments.

95.     The Austin Municipal Court has a policy and practice of failing to give people who are jailed meaningful written notice of the accusations against them, failing to appoint counsel, failing to hold meaningful hearings on ability to pay, and failing to draft written commitment orders for a specific jail term. These policies and practices are so well-settled and widespread that knowledge of the policies and practices is attributable to municipal policymakers.

## CLASS ACTION ALLEGATIONS

96.     The named Plaintiffs bring this action on behalf of themselves and all others similarly situated under Rule 23 of the Federal Rules of Civil Procedure. They seek to represent the class of all persons who, now or in the future, are unable to satisfy their criminal judgment debt assessed in Class C misdemeanor cases in Austin Municipal Court.

97.     This action is brought and may properly be maintained as a class action pursuant to Rule 23(a)(1)-(4) and Rule 23(b)(2) of the Federal Rules of Civil Procedure.

## I.      Numerosity, Rule 23(a)(1)

98.     Members of the putative class are so numerous that joinder is impracticable. In fiscal year 2012–2013, the Austin Municipal Court  and issued 65,711 warrants and commitment orders.[3] During that year, 19.1% of Austin residents lived below the poverty line. Even if impoverished people are marginally over- or under-represented in Austin Municipal Court cases, warrants, and commitment orders, there are thousands of people who are too poor to pay their tickets, and are currently being threatened with arrest and incarceration.

99.     Joinder is also impracticable because membership in the putative class is fluid. New people are ticketed and convicted every day—the average life cycle of a Class C prosecution is just 230 days. Moreover, financial stability is uncertain for people with lower incomes, and someone who is capable of paying their tickets one day may find themselves impoverished the next, due to job loss, injury, or other unforeseen circumstances. Finally, putative class members may moot their claims by serving jail time or paying fines and fees by choosing to miss payments on necessary household expenses.

---

[3] The Austin Municipal Court reports data about warrants and commitment orders together, as one data point, to the Office of Court Administration.

100.     Finally, joinder is impracticable because members of the putative class are poor. They are unable to pay for an attorney to represent their interests or invest the time and money necessary to investigate and litigate their claims pro se.

## II.     Commonality, Rule 23(a)(2)

101.     The relief sought is common to all members of the putative class, and common questions of law and fact exist as to all members of the class. The Plaintiffs seek to enjoin the Austin Municipal Court's unconstitutional policies and practices on a classwide basis. They also seek a declaration that the Austin Municipal Court's policies and practices violate the Sixth Amendment right to counsel and the Due Process and Equal Protection rights of all putative class members.

102.     Among the most important, but not the only, common questions of law and fact are:

   a.   Whether the Austin Municipal Court has a policy and practice of failing to ask about the reasons for a person's failure to pay before imprisoning that person for failure to pay;

   b.   Whether the Austin Municipal Court has a policy and practice of failing to consider alternative punishments before imprisoning a person for failure to pay;

   c.   Whether the Austin Municipal Court has a policy and practice of declining to appoint counsel in Class C misdemeanor cases, then jailing people for the resulting convictions;

   d.   Whether the foregoing policies and practices violate the Sixth Amendment, the Due Process Clause, and/or the Equal Protection Clause;

   e.   Whether the foregoing policies and practices are officially promulgated policies, final decisions by municipal policymakers, practices or customs so widespread and well-settled that knowledge is attributable to municipal policymakers, or the byproduct of Defendant's deliberate indifference to putative class members' rights under the Sixth Amendment, the Due Process Clause, and/or the Equal Protection Clause.

### III.    Typicality, Rule 23(a)(3)

103.    The named Plaintiffs' claims are typical of the claims of the putative class members, and they have the same interests as all other members of the putative class that they represent. The named Plaintiffs' claims arise from the same course of conduct as claims of the putative class, and their claims are based on the same legal theories as those of the putative class.

104.    None of the named Plaintiffs has received unusual treatment by the Austin Municipal Court. Each of them is at risk of suffering injuries—arrest and incarceration—that are typical of injuries that would be suffered from the City's constitutional violations.

105.    By pursuing their claims that the Austin Municipal Court's policies and practices concerning criminal judgment debt collection violates the law in the manner alleged, the named Plaintiffs will likewise benefit every other member of the putative class.

### IV.    Adequacy, Rule 23(a)(4)

106.    The named Plaintiffs are adequate representatives of the putative class because they are members of the class and because their interests coincide with, and are not antagonistic to, those of the class.

107.    There are no known conflicts of interest among putative class members, all of whom have a similar interest in vindicating the constitutional rights to which they are entitled.

108.    Both named Plaintiffs are familiar with the Austin Municipal Court procedures challenged here and the constitutional protections she seeks to vindicate. The named Plaintiffs are prepared to respond to discovery requests in this case. They are enthusiastic about fulfilling the role and duties of a class representative protecting the fundamental constitutional rights of Austin's poorest residents.

109.     Plaintiffs are represented by attorneys from the Texas Fair Defense Project, the University of Texas Civil Rights Clinic, and Susman Godfrey L.L.P. All three entities have experience litigating complex civil rights matters in federal court. Attorneys from the Texas Fair Defense Project and the Civil Rights Clinic have investigated municipal ticketing in Austin for months. Moreover, Susman Godfrey has extensive experience litigating complex civil cases, including class actions, in federal courts across the country, including this Court, the Fifth Circuit Court of Appeals, and the U.S. Supreme Court. Affidavits from Plaintiffs' counsel describing their qualifications accompany the motion for class certification filed simultaneously with this complaint.

110.     Plaintiffs and their attorneys will fairly and adequately protect the interests of the members of the Class.

**V.      Rule 23(b)(2)**

111.     Class action status is appropriate because Defendants have acted and refused to act on grounds generally applicable to the putative class. Defendants' policies and practices with regard to failure to inquire into ability to pay before jailing, failure to consider adequate alternatives to imprisonment before jailing, jailing for convictions obtained without the assistance of counsel, and denying core procedural protections for civil judgment debtors apply equally to the class regardless of differences among class members.

112.     Plaintiffs seek final injunctive and declaratory relief with respect to the constitutional protections due to people prosecuted for Class C offenses in Austin Municipal Court.

113.     Injunctive and declaratory relief with respect to each claim would be appropriate to the class as a whole. All putative class members are entitled to the constitutional protections Plaintiffs seek to enforce.

## CLAIMS FOR RELIEF

### Count One: Failure to Inquire Into Ability to Pay and Alternatives to Incarceration
### (Section 1983 and Due Process Clause)

114.    Plaintiffs incorporate by reference allegations in the foregoing paragraphs.

115.    The Austin Municipal Court has a policy and practice of jailing people who are too poor to pay their criminal judgment debt, without first inquiring into the reasons the person has failed to pay the debt and adequate alternatives to incarceration.

116.    Jailing a person who is too poor to pay her debt without first inquiring into the reasons she has failed to pay her debt and adequate alternatives to incarceration violates the Due Process Clause of the Fourteenth Amendment. *Bearden v. Georgia*, 461 U.S. 660, 666 (1983).

### Count Two: Commitment to Jail Solely Due to Inability to Pay
### (Section 1983 and Equal Protection Clause)

117.    Plaintiffs incorporate by reference allegations in the foregoing paragraphs.

118.    The Austin Municipal Court has a policy and practice of jailing people solely because they are unable to pay their debts arising from fines for Class C misdemeanors.

119.    Jailing a person solely because they lack the resources to pay a fine violates the Equal Protection Clause of the Fourteenth Amendment. *Tate v. Short*, 401 U.S. 395 (1971); *Williams v. Illinois*, 399 U.S. 235 (1970).

### Count Three: Commitment to Jail for
### Convictions Without Assistance of Counsel
### (Section 1983 and the Right to Counsel and Due Process Clauses)

120.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs.

121.    The Austin Municipal Court has a policy and practice of failing to appoint counsel for people charged with Class C misdemeanor offenses or to obtain a knowing, voluntary, and intelligent waiver of the right to counsel. The Austin Municipal Court also has a

policy and practice of jailing people to satisfy judgments of conviction for Class C misdemeanors that were obtained without the assistance of counsel.

122.    The Sixth Amendment right to counsel applies against state and local governments as incorporated through the Due Process Clause of the Fourteenth Amendment.

123.    Sentencing a person to imprisonment as a result of a criminal conviction obtained without the assistance of counsel, and in the absence of a knowing, voluntary, and intelligent waiver of the right to counsel, violates the Sixth Amendment right to counsel. *Alabama v. Shelton*, 535 U.S. 654 (2002); *Argersinger v. Hamlin*, 407 U.S. 25 (1972).

**Count Four: Unduly Harsh and Discriminatory Debt Collection
(Section 1983 and Equal Protection Clause)**

124.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs.

125.    The Austin Municipal Court has a policy and practice of  without notice or appointment of counsel, failing to make findings of willfulness before jailing, and jailing people with unclear orders of commitment to collect Class C debts. Use of these tactics for civil judgment debt collection is prohibited by Texas law.

126.    The tactics used by the Austin Municipal Court are unduly harsh and discriminatory methods of debt collection when compared with the debt collection tactics permitted by a private creditor.

127.    Use of unduly harsh and discriminatory debt collection practices against people who are too poor to pay criminal judgment debt violates the Equal Protection Clause of the Fourteenth Amendment. *James v. Strange*, 407 U.S. 128 (1972).

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court issue the following relief:

1.      An injunction prohibiting Defendants from:

      a.      imprisoning class members for failure to satisfy their debt without inquiring into the reasons for their failure to satisfy the debt or adequate alternatives to imprisonment, specifically, tailoring the debt to the class member's resources;

      b.      imprisoning class members solely because they lack the resources to satisfy their debt;

      c.      imprisoning class members as a result of convictions for which the class member did not have assistance of counsel or knowingly, intelligently, and voluntarily waive that right; and

      d.      imprisoning class members to collect criminal judgment debt without the core legal protections required for collection of debt by a private creditor;

2.      A declaration that the foregoing practices violate the class members' constitutional rights as alleged;

3.      An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

4.      Any other relief this Court deems just and proper.


                   Respectfully Submitted,

          By:    /s/ Rebecca Bernhardt

                   Rebecca Bernhardt
                   Texas Bar No. 24001729
                   Susanne Pringle
                   Texas Bar No. 24083686
                   Texas Fair Defense Project
                   510 S. Congress Ave., Suite 208
                   Austin, TX 78704
                   (512) 637-5220 (t)
                   (512) 637-5224 (f)
                   rbernhardt@fairdefense.org

springle@fairdefense.org

Ranjana Natarajan
Texas Bar No. 24071013
Trisha Trigilio
Texas Bar No. 24075179
University of Texas School of Law
Civil Rights Clinic
727 East Dean Keeton Street
Austin, TX 78705
Tel: 512-232-7222
Fax: 512-232-0800
rnatarajan@law.utexas.edu
ttrigilio@law.utexas.edu

Joseph S. Grinstein (TX Bar No. 24002188)
Neal Manne (TX Bar No. 12937980)
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone:  (713) 651-9366
Facsimile:  (713) 654-6666
jgrinstein@susmangodfrey.com
nmanne@susmangodfrey.com