IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

KARIAN HARRIS, On Behalf of Herself and All
Others Similarly Situated,
      Plaintiff,

-vs-                Case No. A-15-CA-956-SS

CITY OF AUSTIN,
      Defendant.

## O R D E R

BE IT REMEMBERED on the 13th day of January 2016, the Court held a hearing in the above-styled cause, and the parties appeared by and through counsel. Before the Court is Defendant City of Austin's Motion Re-Urging Defendant's Rule 12(b)(6) Motion to Dismiss [#17], Defendant's Rule 12(b)(6) Motion to Dismiss [#8], Plaintiff Karian Harris's Response [#18] in opposition, Defendant's Reply [#22] in support, and Plaintiff's Surreply [#25] in opposition. Having considered the documents, the governing law, the arguments of the parties at hearing, and the file as a whole, the Court now enters the following opinion and orders.

### Background[1]

Plaintiff Karian Harris, on behalf of herself and a prospective class, brings this 42 U.S.C. § 1983 suit against the City of Austin. Harris claims the City has a practice of jailing people who are too poor to pay their fines and fees for traffic tickets and other petty misdemeanors in violation

---

[1] As this is a motion to dismiss, the background facts are drawn from Harris's complaint and accepted as true for present purposes to the extent they are not legal conclusions. *See, e.g., Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993).



of their constitutional rights to due process, equal protection, and counsel. Harris seeks a declaration the City's alleged practices violate the Fourteenth and Sixth Amendments to the United States Constitution and an injunction prohibiting the City from jailing people who cannot pay because they lack the ability to do so.

### A. Karian Harris

Harris is a thirty-five-year-old single mother who lives in Austin with her seven children. She makes less than $6,000 per year as a childcare aid at an elementary school, and receives food stamps, Section 8 housing assistance, and free school lunches for her children. Over the last 14 years, Harris has received a number of traffic tickets, most of which were citations for driving without a current inspection or without insurance. According to Harris, she could not afford expenses like a car inspection, car insurance, or the fines associated with her traffic citations, but continued to drive "to care for her children." First Am. Compl. [#15] ¶ 11.

Warrants for Harris's arrest were issued as a result of her unpaid traffic tickets, and in December 2010, Harris was arrested. An Austin Municipal Court judge ordered Harris to spend "more than two weeks in jail[.]" *Id.* ¶ 13. Before ordering Harris be incarcerated for failure to pay her fines and fees, the judge "did not ask Ms. Harris about her income, her dependents, or other factors bearing on her ability to pay"; nor did he "inquire into her ability to complete community service," "consider reducing the debts based on [her] ability to pay," or appoint counsel for Harris. *Id.* ¶ 14. At the time, Harris was working as a housekeeper, making $6.50 per hour and working 25 hours per week; as a result of her incarceration, Harris lost her job.

In January 2013, Harris was pulled over and cited for driving without a valid license, expired registration, and driving without insurance. Harris could not afford to pay the fines associated with

those tickets, and more warrants were issued for Harris's arrest based on her failure to pay. Harris was arrested in June 2013, and an Austin Municipal Court judge, again without inquiring into Harris's ability to pay her fines or appointing her counsel, ordered Harris either to pay $600 or spend four days in jail. Harris went to jail.

Since her 2013 incarceration, Harris has received two more traffic tickets for lack of car insurance and for driving without a valid license. Harris appeared in court regarding the tickets and was ordered to pay $75 per month until her traffic debts were paid off; she paid one installment, then lost her job and stopped paying. While Harris is now employed, she cannot afford to pay $75 per month on her current income, and cannot renew her driver's license because of her unpaid tickets.

**B.    Austin Municipal Court & Class C Prosecutions**

The City vests the Austin Municipal Court with jurisdiction over "fine-only" crimes, or Class C misdemeanors, such as failing to signal when changing lanes or entering a park after hours. First Am. Compl. [#15] ¶ 29. The City Council appoints the Austin Municipal Court's Clerk of Court and Presiding Judge. *Id.* ¶ 30. The Presiding Judge "has the duty to adopt 'rules for the orderly trial of a case in the municipal court.'" *Id.* Harris alleges the Presiding Judge and Clerk of Court "act as final policymakers for the Austin Municipal Court[,]" setting "municipal policies and practices entirely separate from—and in some cases contrary to—the municipal judges' authority under state law." *Id.* ¶ 31.

As in Harris's case, Class C prosecutions typically start with a ticket being issued by a police officer. The person ticketed must sign the ticket, which contains a promise either to pay a fine or to appear in Austin Municipal Court. If a person does not pay the fine and does not appear in court, the municipal judge may reschedule the appearance, issue a summons ordering the person to appear,

or issue a warrant for the person's arrest. First Am. Compl. [#15] ¶ 39 (citing TEX. CODE CRIM. PRO. arts. 15.03, 45.014). Harris alleges the Austin Municipal Court "has a policy and practice of issuing an arrest warrant and increasing all fines by 50% the first time a person fails to appear"; additionally, for each ticket for which a warrant issues, the court charges an additional $50 fee. *Id.* ¶ 40. These warrants can be cleared from a person's record, but only through the payment of "bail"—the full amount the ticket would cost if the ticketed person pled guilty to the offense. *Id.*

Once arrested pursuant to an outstanding warrant, the ticketee must go to trial, plead no contest, or plead guilty. *Id.* ¶ 42. If convicted, the court may assess a fine of up to $500 and require the ticketee pay court costs. *Id.* Various other fees may also apply; for example, the Austin Municipal Court charges a $25 fee to set up a payment plan (for each outstanding ticket), a $30 fee for any payment by check or credit card that is rejected, and a $30 fee for driver's license renewal suspension. *Id.* ¶ 45. Further, if a ticket is sent to a collections agency, the court charges a 30% collection fee. *Id.*

According to Harris, although Texas law permits the partial or full waiver of such debts or the conversion of such debts to civil judgments for those who are too poor to pay their fines and fees, "the court has a policy and practice of limiting people to two options—community service or a payment plan on the full amount of the debt—regardless of whether these options impose an undue hardship." *Id.* ¶ 47. Additionally, Harris claims, if a person misses a payment or community service, the court issues a "capias pro fine" warrant for that person's arrest, for which the court charges another $50 fee. *Id.* ¶¶ 49, 52. If the person appears in court to clear the capias warrants, the court either "demand[s] the amount of money in the person's pockets" if the outstanding debt is small, or if it is large, "asks how much money the person would be able to produce that day, and orders the

person to produce that amount under the threat of jail time." *Id.* ¶ 51. Once debts associated with capias warrants are sent to collections, the warrants can only be cleared if the person makes separate payments on each outstanding ticket. *Id.* ¶ 50.

Those who cannot pay are ultimately subject to a jail commitment hearing, jailed, and issued "jail credit" against their debt for time served. *Id.* ¶¶ 54, 55, 60. No inquiry into ability to pay or to perform community service takes place at these hearings, and the persons jailed are not represented by court-appointed counsel. *Id.* ¶¶ 59, 72. Harris alleges the amount of credit given for a day in jail is typically $100, but can vary based on the length of time the person spends in jail before being released by the Travis County Sheriff's Office. *Id.*

C. **Procedural History**

Former named plaintiffs Valerie Gonzales and Maria Salazar filed the initial complaint in this action on October 27, 2015. *See* Compl. [#1]. On December 8, 2015, Harris filed the First Amended Complaint, which removed Gonzales and Salazar as named plaintiffs and replaced them with Harris. *See* First Am. Compl. [#15]. The First Amended Complaint raises four § 1983 claims: (1) a Fourteenth Amendment due process claim predicated on the Austin Municipal Court's alleged failure to inquire into ability to pay and alternatives to incarceration; (2) a Fourteenth Amendment equal protection claim predicated upon the Austin Municipal Court's alleged policy of jailing people solely because they are too poor to pay their fines; (3) a Sixth Amendment right to counsel claim; and (4) a Fourteenth Amendment equal protection claim predicated on the Austin Municipal Court's allegedly discriminatory methods of debt collection. *See id.* ¶¶ 101–14.

After the First Amended Complaint was filed, the City re-urged its previously filed motion to dismiss. *See* Mot. Re-Urging Mot. Dismiss [#17]. The motion is now ripe for decision.

## Analysis

### I. Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A motion under Federal Rule of Civil Procedure 12(b)(6) asks a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). The plaintiff must plead sufficient facts to state a claim for relief that is facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 566 U.S. at 678. Although a plaintiff's factual allegations need not establish that the defendant is probably liable, they must establish more than a "sheer possibility" that a defendant has acted unlawfully. *Id.* Determining plausibility is a "context-specific task," and must be performed in light of a court's "judicial experience and common sense." *Id.* at 679.

In deciding a motion to dismiss under Rule 12(b)(6), a court generally accepts as true all factual allegations contained within the complaint. *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993). However, a court is not bound to accept legal conclusions couched as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Although all reasonable inferences will be resolved in favor of the plaintiff, the plaintiff must plead "specific facts, not mere conclusory allegations." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994). In deciding a motion to dismiss, courts may consider the complaint, as well as other sources such as documents incorporated into the complaint by reference,

and matters of which a court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## II. Application

Under 42 U.S.C. § 1983, "[a]ny person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject or cause to be subjected, any person to the deprivation of any rights, privileges or immunities secured by the Constitution of the United States, shall . . . be liable to the party injured . . . ." A municipality is a "person" subject to suit under § 1983. *See Monell v. N.Y.C. Dept. of Soc. Servs.*, 436 U.S. 658, 690 (1978). In *Monell*, however, the Supreme Court held a municipality can be liable under § 1983 only where the municipality itself causes the constitutional violation at issue. *See id.* at 694–95. Specifically, a municipality can be sued "if it is alleged to have caused a constitutional tort through 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 166 (5th Cir. 2010) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988)). Alternatively, a municipality can be held liable "where the constitutional deprivation is pursuant to a governmental custom, even if such custom has not received formal approval." *Id.* (citing *Monell*, 436 U.S. at 690–91). Municipal liability under § 1983 requires proof of three elements: (1) a policymaker; (2) an official policy; and (3) a violation of constitutional rights whose moving force is the policy or custom. *Id.* (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)).

In its motion to dismiss, the City argues it cannot be liable under § 1983 for having a policy of wrongfully incarcerating indigent defendants because the relevant decisions were made by municipal judges acting in their judicial capacities. Even if Harris's allegations concerning Austin

municipal judges' failure in practice to appoint counsel and conduct indigency hearings are true, the City claims, those judges are performing judicial functions, and actions taken by municipal judges in their judicial capacities cannot constitute municipal policy. The Court agrees with the City, and finds Harris's complaint must be dismissed.

In support of its position, the City relies in large part on two Circuit opinions: *Johnson v. Moore*, 958 F.2d 92 (5th Cir. 1992), and *Eggar v. City of Livingston*, 40 F.3d 312 (9th Cir. 1994). In *Johnson*, the plaintiff sued a municipal court judge and the municipality under § 1983, alleging his constitutional rights were violated when the judge sentenced him to jail without appointing him counsel or obtaining a waiver of his right to counsel. *Johnson*, 958 F.2d at 93. The plaintiff claimed the judge's actions in sending him to jail without affording him representation were part of an official municipal policy. *Id.* Affirming dismissal of the plaintiff's § 1983 claims, the panel explained "[w]e have repeatedly held . . . that a municipal judge acting in his or her judicial capacity to enforce state law does not act as a municipal official or lawmaker." *Id.* at 94 (citing *Bigford v. Taylor*, 834 F.2d 1213, 1221–22 (5th Cir. 1988); *Carbalan v. Vaughn*, 760 F.2d 662, 665 (5th Cir. 1985); *Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980)). The Circuit recognized its previous decision in *Familias Unidas v. Briscoe* distinguished "administrative duties," the exercise of which might be actionable as municipal policy under *Monell*, from a judge's "judicial function, in which he or she effectuates state policy by applying state law." *Id.* (citing *Familias Unidas*, 619 F.2d at 404). The panel observed the *Johnson* plaintiff was not contending the municipal court judge jailed him pursuant to "administrative or other non-judicial duties," and instead argued only that "the municipal judge is a final policymaker whose official actions constitute municipal policy." *Id.* Rejecting the plaintiff's position, the panel explained his argument "ignores the distinction we have

consistently drawn between a judge's judicial and administrative duties. Only with respect to actions taken pursuant to his or her administrative role can a judge be said to institute municipal policy under . . . *Monell*." *Id.*

In *Eggar v. City of Livingston*, the second case relied upon by the City, the Ninth Circuit affirmed the lower court's grant of summary judgment on the plaintiffs' § 1983 claims to a city and municipal judge on grounds the plaintiffs failed to demonstrate the municipal judge was a municipal policymaker or had followed an unconstitutional city policy. 40 F.3d at 313. The *Eggar* plaintiffs alleged the city "had a policy of imprisoning indigent defendants without offering appointed counsel and without securing an effective waiver of the right to counsel" and that the defendant judge "acted as a policy maker for the [c]ity" when he failed to meaningfully advise indigent defendants of their rights. *Id.* at 313, 14. Further, the *Eggar* plaintiffs argued the judge "operated outside of his state judicial capacity by consistently violating [state] law regarding the right to counsel." *Id.* at 315.

Citing to *Johnson* and *Familias Unidas*, the Ninth Circuit rejected the plaintiffs' arguments. First, the panel explained whether the judge violated state law regarding the right to counsel was irrelevant to the question whether he was performing a judicial or administrative function:

> That Judge Travis allegedly performed his duty to advise indigents of their rights in a way that makes a mockery of those rights does not make that duty administrative. The Judge's failure to follow state law or federal constitutional law does not transform his "cattle-call" method of counseling into municipal policymaking. As state law makes clear, the Judge's obligation to address the rights of defendants arises from his membership in the state judiciary. It is lamentable, but irrelevant, that he failed miserably to meet this obligation under both state and federal standards: he simply is not a municipal decision maker in this context.

*Id.* at 315–16 (citation omitted). The court also rejected the plaintiffs' theory of liability based on policy and custom, explaining that because the judge "was functioning as a state judicial officer, his

acts and omissions were not part of a city policy or custom. A municipality cannot be liable for judicial conduct it lacks the power to require, control, or remedy, even if that conduct parallels or appears entangled with the desires of the municipality." *Id.* at 316.

Harris, in response, states *Johnson* and *Eggar* "do not stand for the broad proposition that a municipal judge never establishes municipal policies and practices" and that the correct question is "whether municipal judges are exercising power conferred by *state law* or are acting as *municipal policymakers*." Resp. [#18] at 14. Harris invites the Court to infer the Presiding Judge cannot be "exercising power conferred by state law" (and therefore must, presumably, be acting as a municipal policymaker) in creating procedures concerning indigency and incarceration because those procedures violate state law, which requires municipal court judges hold an indigency hearing before a person may be jailed for failure to pay a judgment debt and provides an indigent defendant facing the prospect of jail is entitled to counsel. *See* TEX. CRIM. PROC. CODE art. 45.046(a)(2) ("When . . . the defendant defaults in the discharge of the judgment, the judge may order the defendant confined in jail . . . if the judge at a hearing makes a written determination that . . . the defendant is indigent and . . . has failed to make a good faith effort to discharge the fines and costs [by performing community service] and . . . could have discharged the fines and costs [by performing community service] without experiencing any undue hardship."); *id.* art. 1.051(c) (indigent defendant "is entitled to have an attorney appointed to represent him in any adversary judicial proceeding that may result in punishment by confinement[.]" ).

According to Harris, this Court should instead look to the Eighth Circuit's decision in *Williams v. Butler*, 863 F.2d 1398 (8th Cir. 1988) (en banc), and a District of Columbia district court opinion, *Singletary v. D.C.*, 685 F. Supp. 2d 81 (D.D.C. 2010), for guidance. In *Williams v. Butler*,

two former clerks of a municipal court sued the municipal judge in his official capacity under § 1983, alleging the judge terminated them in violation of their First Amendment rights. 863 F.2d at 1399. The judge filed a third-party complaint against the municipality, alleging it was liable for any damages assessed against him, and the trial court agreed. *Id.* Ultimately, the Eighth Circuit affirmed the district court, reasoning the municipality could be held liable for the judge's actions because the municipality conferred on the judge "an absolute delegation of authority" concerning employment decisions in the municipal court. *Id.* at 1402. The *Williams* court emphasized that the judge's authority to hire and fire court employees was unconstrained by any other policymaker, which was emphasized by the city's litigation position that it "was not empowered to hire or fire municipal court employees" and a personnel statement from the municipal court which treated municipal court employees "differently and completely separate from any other municipal employee." *Id.* at 1402–03. The court also noted hiring and firing were traditional municipal functions and that a state statute authorized the judge of that particular municipal court to make employment decisions. *Id.* at 1403.

The district court in *Singletary v. District of Columbia* denied the District of Columbia (D.C.)'s motion to dismiss the plaintiff's § 1983 claim seeking to hold D.C. liable for the D.C. Parole Board's allegedly wrongful revocation of the plaintiff's parole. 665 F. Supp. 2d at 83. The plaintiff alleged that at the time the D.C. Parole Board made the decision to revoke his parole, it was the final municipal decision-maker with respect to parole revocation—a characterization that D.C. did not challenge. *Id.* at 90. Citing to *Eggar* and *Johnson*, among other cases, D.C. argued it could not be liable for the actions of the Parole Board because like "a single judicial decision made by a municipality's judge or court," a single decision of the Parole Board could not "expose a

municipality to [§ 1983] liability" because it could not constitute municipal policy. *See id.* at 92 & n.7. The *Singletary* court rejected that argument for two reasons: first, because the D.C. Parole Board was "an executive entity," not a part of the judicial branch, even if its revocation decision was quasi-judicial in nature; and second, because "the cases relied upon by [D.C.] do not . . . establish the overarching principle that judicial action can never give rise to municipal liability." *Id.* at 92. Specifically, the *Singletary* court construed *Johnson*, *Eggar*, and the other cases D.C. cited to:

> stand for the much more limited proposition that a municipality may not be held liable under Section 1983 for actions taken by a municipal judge pursuant to his or her authority under *state* law, as the judge's actions in such a case are properly attributed to the state rather than the municipality. That is, that the judges are not acting as final policymakers for the local governmental entities. These cases are consistent with the Supreme Court's recognition that local government officials may in some cases be treated as acting on behalf of the state rather than the local governmental entities.

*Id.* (citing *McMillian v. Monroe Co., Alabama*, 520 U.S. 781 (1997) (finding that "Alabama sheriffs, when executing their law enforcement duties, represent the State of Alabama, not their counties")).

Based upon the cases cited by both parties, it seems to the Court the proposition that a municipality may be held liable based on the actions of a municipal judge where those actions are not an exercise of the judge's "authority under state law," but rather, are an exercise of some other type of non-judicial power conferred by the municipality, is unobjectionable. The key question, to be clear, is whether the judge was acting in a *judicial role* or a *non-judicial* role at the time he or she took the challenged action. *Williams* is an example of that principle in action; in *Williams*, the city delegated all of its hiring and firing authority to the municipal judge, and agreed that it had no hand in or authority over the judge's decisions about employees of the municipal court. As such, it was proper to hold the municipality liable for the judge's actions, because the judge was not exercising

a judicial function pursuant to his "authority under state law," but a traditionally municipal, non-judicial function delegated to him by the municipality. *See Williams*, 863 F.2d at 1402. Similarly, when the *Johnson* court held "a municipal judge acting in his or her judicial capacity to enforce state law does not act as a municipal official," it explicitly distinguished the exercise of administrative duties from the exercise of judicial duties and noted municipal liability could flow only from the former. *See Johnson*, 958 F.2d at 94.

Harris, however, conflates the source of judicial power—"authority under state law"—with the legality of the challenged judicial action under state law, arguing that in failing to hold indigency hearings and provide counsel, the Presiding Judge and other municipal court judges could not have been "acting in [their] judicial capacity to enforce state law" because they are violating it. Harris is incorrect. The distinction between a judge who is exercising judicial authority and a judge who is acting as a municipal policymaker does not turn upon whether or not the judge's judicial pronouncements are made in accordance with state law. Stated more plainly, a municipal judge's illegal pronouncement does not become a non-judicial act merely because it is illegal. *Cf. Mireles v. Waco*, 502 U.S. 9, 12–13 (1991) ("[W]hether an act by a judge is a 'judicial' one relates to the nature of the act itself, *i.e.*, whether it is a function normally performed by a judge . . . . Of course, a judge's direction to police officers to carry out a judicial order with excessive force is not a 'function normally performed by a judge.' But . . . [i]f judicial immunity means anything, it means that a judge will not be deprived of immunity because the action he took was in error . . . or was in excess of his authority.") (internal quotations and citations omitted).

As explained above, precisely this argument was presented to and rejected by the Ninth Circuit in *Eggar*. The *Eggar* plaintiffs took the position the municipal judge "operated outside of

his state judicial capacity by consistently violating [state] law regarding the right to counsel." 40 F.3d at 315. The panel rejected that argument, explaining a municipal judge's "failure to follow state law or federal constitutional law" by neglecting to inform criminal defendants of their right to counsel did not "transform" that failure "into municipal policymaking." *Eggar*, 40 F.3d at 315–16; ("It is lamentable, but irrelevant, that [the judge] failed miserably to meet this obligation under both state and federal standards: he simply is not a municipal decision maker in this context."). This was so because the function the judge was carrying out—deciding whether or how to advise municipal court defendants of their rights—"ar[ose] from his membership in the state judiciary." *Id.* Similarly, the function municipal judges of the Austin Municipal Court carry out in determining whether an individual should be jailed for failure to pay is no less a judicial function, arising from the power vested in municipal judges by the state of Texas, if those judges are flouting the law in discharging it.

Finally, Harris argues that the municipal judges are executing municipal policy in this case because the Austin City Code gives the Presiding Judge authority to adopt "rules for the orderly trial of a case in the municipal court," AUSTIN CITY CODE § 2-10-11(B)(2), and "the Municipal Court has adopted rules that lead to the unconstitutional practices challenged in this case[.]" Resp. [#18] at 19. The Court cannot agree. First, the promulgation of rules for the orderly trial of cases seems to the Court to be more judicial than non-judicial in nature. While rulemaking is obviously not adjudicative, rules of court regulate procedure—"the judicial process for enforcing rights and duties recognized by substantive law and for justly administering a remedy and redress for disregard or infraction of them." *Sibbach v. Wilson*, 312 U.S. 1, 14 (1941); *see also United States v. Smith*, 686 F. Supp. 847, 864 (D. Colo. 1988) (characterizing rules "formulated by the judiciary" of "internal

management," "regulation," and "administrati[on]" as "within the shadow of the judicial power"). The Austin Municipal Court's Rules, it should be noted, are issued by judicial order signed by the Presiding Judge. *See* Resp. [#18] Ex. B (Rules) at 3.

Second, even assuming for the sake of argument that the Rules can be characterized as municipal policy, those Rules plainly contemplate the exercise of judicial discretion, as they do not mandate that municipal judges take any particular action with respect to any defendant. The relevant Rules are as follows:

> **9.4** **Inability to Pay Fine.** If a defendant does not appeal the court's decision, but is unable to pay the fine when due, the defendant may request an extension to pay or a payment plan. If the defendant qualifies, the court may allow the defendant to pay the fine in installments or discharge the fine by performing community service.
>
> **9.5** **Warrant.** If a defendant does not pay the fine, meet all obligations of an installment payment plan, or discharge the fine by performing community service as ordered by the court, a warrant will be issued which will subject the defendant to arrest.

Rules at 12. Nothing in these rules in any way requires a judge to commit a defendant to jail where the defendant is unable to pay. Rather, the court "may allow" the defendant to discharge the debt in a number of other ways. If in the event the defendant does not satisfy his or her obligations as determined by the municipal judge, a warrant will issue for the defendant's arrest. Nothing about these Rules alters the fact that in all cases, the municipal judge hearing each individual case—and in so doing, acting in his judicial capacity—makes the ultimate decisions about what will or will not happen in a particular defendant's case. In sum, as the Fifth Circuit has repeatedly held, "[t]he City cannot be liable under § 1983 for having a 'policy' of wrongfully incarcerating indigent defendants because the relevant decisions were made by a municipal judge acting in his judicial capacity."

*Whisenant v. City of Haltom City*, 106 F. App'x 915, 917 (5th Cir. 2004) (dismissing § 1983 claim against city based on city's alleged policy of incarcerating defendants unable to pay misdemeanor fines without holding indigency hearings or appointing counsel); *DeLeon v. City of Haltom City*, 106 F. App'x 909, 911 (5th Cir. 2004) ("We reject the contention that the City had the power to set judicial policy for a municipal judge, . . . or that it could have ratified a municipal judge's judicial conduct, even if its policymakers knew of the judge's conduct and approved of it."); *see also Burks v. Price*, CIVIL ACTION NO. 6:13cv746, 2015 WL 3622684, at *8 (E.D. Tex. June 10, 2015) ("[A]ny decisions regarding whether or not to hold an indigency hearing would be made by the judge, not by the municipality. The Fifth Circuit has held that a municipal judge acting in his judicial capacity does not act as a municipal official or lawmaker.") (citing *Johnson*, 958 F.2d at 94).

Harris's allegation the City of Austin has an unconstitutional policy as to municipal court proceedings conducted by a judge in the exercise of his or her judicial authority does not support a claim for relief against the City under 42 U.S.C. § 1983. As such, the City's motion to dismiss is due to be granted.

## Conclusion

Accordingly:

IT IS ORDERED that Defendant City of Austin's Motion Re-Urging Defendant's Rule 12(b)(6) Motion to Dismiss [#17] is GRANTED; and

IT IS ORDERED that Plaintiff Karian Harris's complaint in the above-styled and numbered cause is DISMISSED WITHOUT PREJUDICE.

SIGNED this the 15th day of March 2016.

```
                                    _____
                                    SAM SPARKS
                                    UNITED STATES DISTRICT JUDGE
```